22-08/PJG

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
INDUSTRIAL CARRIERS INC.,

               07 CV 7937 (RMB)

      Plaintiff,

 -against-

DAYTON COMMERCIAL LIMITED a.k.a.
GALVANIZED STEEL CONSUMERS
ASSOCIATION a.k.a. GSCA a.k.a. GSCA
LIMITED a.k.a. TOP UNION,

      Defendants.
------------------------------------------------------------x


## REPLY MEMORANDUM OF LAW OF INTERESTED PARTY TOP UNION (CHINA) IN FURTHER SUPPORT OF APPLICATION FOR VACATURE OF ATTACHMENT


            FREEHILL HOGAN & MAHAR, LLP
            Attorneys for Top Union (China) Limited
            80 Pine Street
            New York, NY  10005
            (212) 425-1900
            (212) 425-1901 fax

Peter J. Gutowski
Manuel A. Molina
Of Counsel

NYDOCS1/299043.1

## TABLE OF CONTENTS

                                                            **PAGE**

SUMMARY OF ARGUMENT ON REPLY ........................................................................... 1

REPLY ON THE FACTS .................................................................................................... 1

ARGUMENT

POINT I

THE RISK OF NON-PERSUASION AS TO WHY THE ATTACHMENT SHOULD NOT BE VACATED RESTS WITH PLAINTIFF .................................................................. 5

POINT II

AS PLAINTIFF HAS RESTRAINED THE PROPERTY OF THE WRONG ENTITY, THE ATTACHMENT MUST BE VACATED AND THE FUNDS RELEASED .......................................................................................................................... 6

      A.      Top Union China did not charter the NAVIOS HERACLES or the MANAS. ................................................................................................................ 7

      B.      The LOI is Completely Bogus. ....................................................................... 9

      C.      The Infospectrum Report ............................................................................... 10

CONCLUSION ................................................................................................................... 12

## SUMMARY OF ARGUMENT ON REPLY

This Reply Memorandum is submitted on behalf of interested party Top Union (China) Limited ("**Top Union China**") in further support of its application to vacate the attachment and in response to the opposition submitted by Plaintiff Industrial Carriers ("Industrial Carriers").

For the reasons outlined more fully below, this attachment was ill conceived and improperly investigated when it was filed. The Plaintiff has restrained funds of a completely innocent and unrelated entity, and has then sat back waiting to see whether that innocent third party can prove its innocence, or, better stated, prove a negative. As it turns out, Top Union China has done just that, *convincingly*, because it is an innocent and unrelated third party that had no involvement with any of these transactions.

In fact, not only has Top Union China demonstrated its lack of involvement, but its investigation has also revealed the true identity of the charterer behind these trades. That same evidence was readily available to the Plaintiff, yet it failed to conduct any manner of an investigation before launching its Rule B restraint. The attachment of Top Union China funds was reckless and Plaintiff should thus be compelled to pay the fees and expenses in securing the release of the assets wrongfully restrained.

## REPLY ON THE FACTS

Boiled down to its essence, the Plaintiff supports the proposition that it can freeze the assets of Top Union China because it claims that the latter had been identified as the prior charterer of the vessels NAVIOS HERACLES and the MANAS in the subject ALEXIS charter party. Plaintiff's counsel, elevating itself to the level of an expert, explains to the Court that maritime parlance, the mere reference to these prior charters were performed under the "account"

of Top Union supposedly indicates that this entity is the former name under which its present charterer (Dayton) traded and, *presto*, Top Union is a viable target defendant.

No support for this proposition is contained anywhere in the Plaintiff's opposition papers, and the appropriate interpretation to be ascribed to the phrase "under account Top Union" is anything but the certainty Plaintiff claims it to be. Those words, to the extent they are accurate (which they are not) merely aver that some entity named "Top Union" made two prior shipments, but the rest is an unsubstantiated leap of faith on the part of the Plaintiff.

Apart from the fragile platform upon which Plaintiff asserts it's "a.k.a." argument, the underlying facts are simply not true. As discussed more fully below, Top Union China was not in fact the charterer of the NAVIOS HERACLES, or the charterer of the MANAS, and the so called LOI was about as flimsy a forged document as it gets.

Turning first to the NAVIOS HERACLES, and as discussed more fully in the Gutowski Reply Affidavit, Hyundai Merchant Marine, the disponent Owner of that vessel, has confirmed in unequivocal terms that it never chartered the vessel to a "Top Union" entity, let alone Top Union China. (See, Gutowski Reply Aff'd at ¶'s 9-23, and Ex. 9, confirming that Hyundai never chartered the vessel to Top Union.) Therefore, Plaintiff's position - that Top Union China's assets can be frozen because it was a prior charterer in the string of contracts identified in the ALEXIS - is wrong.

Moving on to the other vessel, the M/V MANAS, the comprehensive and detailed investigation undertaken to reveal the true charter of that vessel also confirms that it was not Top Union China, who had nothing whatsoever to do with that transaction. (See, Huang Reply Dec'l at ¶'s 12-34 detailing the investigation and confirmations obtained from parties around the world that it had nothing whatsoever to do with that charter.) Indeed it has never chartered a ship.

There is an old expression that if you want to find the truth, just follow the money. In this case, Top Union China, placed in the position of having to prove a negative, did just that and its investigation has revealed the real party behind this string of contracts by examining where the freight came from. As outlined in the Huang Declaration, the freight paid on the MANAS did not come from Top Union or any company with even a similar name, but rather came from some entity called Unicon Trading, based apparently in Belize, with an account at FBME Bank in Cyprus. (See, Huang Reply Dec'l at 15-34 and Exhibit 5 thereto, bank transfer details showing identity of party paying the freight.)

Not surprisingly, this was the same entity who paid the Plaintiff the freight in the subject ALEXIS charter, notwithstanding the bogus identification of some company called Dayton Commercial in the contract itself. (See, Gutowski Reply Aff. at 34-45 and Exhibit 10 showing the Plaintiff received its freight payment on the ALEXIS from the same Belize entity, Unicon Trading, via FBME Bank in Cyprus.)

It is not and it should not be the burden of an innocent third party to go out and search around the globe for the evidence of its innocence, but this is what Top Union has had to do, and the results are compelling. What makes this situation so frustrating, however, and indeed reckless on the part of the Plaintiff, is that all of this information was readily available to Plaintiff before it cavalierly tossed the name "Top Union" into the caption and seized the funds of this innocent party. If Plaintiff Industrial Carriers had bothered to look at who it had received the freight from, and if it had bothered to do even the most cursory of investigations by contacting the broker (Paksu) on the MANAS before it filed its action, it would have seen who the real charterer was and that the reference to this "Top Union" entity was as illusory as the reference to

Dayton Commercial is in the current charter.[1] Following the money reveals that Unicon Trading is the entity behind the curtain, but that trail certainly does not lead back to Top Union China.

Last, but not least, Plaintiff's gleeful effort to point to the LOI (supposedly issued by Top Union China in the MANAS case) does little more than reveal the utter lack of proper investigation before filing. First, the Plaintiff had no idea of the existence of this LOI when it filed, and when the LOI surfaced from Paksu's file in the wake of the motion to vacate, Plaintiff felt it had hit pay dirt. Plaintiff should have dug below the surface before it waived that LOI as the bedrock upon which it supported its attachment because it is bogus.

Apart from the fact that the Plaintiff cannot describe in any particularity where it came from, who signed or how it even came into Paksu's hands, the affirmative proof submitted by Top Union China in its reply utterly debunks any notation that it was a legitimate LOI issued by Top Union China. As described in the Huang Declaration, the document is a complete fake and (i) does not contain the actual Top Union China logo; (ii) has a bogus square stamp when all stamps in China are round; (iii) is not signed by any one from Top Union China; and, (iv) the address is of its corporate registered agent easily accessible from the web. (See, Huang Reply Dec'l. at ¶'s 35-63 and Exhibits 6-8.)

Finally, Top Union China's contact with the third parties involved in the MANAS and NAVIOS HERACLE transactions confirm that Top Union China had no involvement whatsoever in those transactions. (See, Huang Reply Declaration at 12-34 and 64-90 detailing investigation with the brokers, agents and owners of those two vessels.)

At bottom, Plaintiff has absolutely no concrete evidence upon which to support its proposition that Top Union China was a prior charterer, not that such status would provide a

---

[1] Indeed, if the Plaintiff had read its own investigative report from Infospectrum, it would have seen that there was no Dayton based in the U.K. or any where else for that matter. (See, Exhibit 3 to Tisdale Declaration.)

legitimate basis upon which to seize assets in a claim against some illusory entity who called itself Dayton. This was a poorly investigated and cavalierly drawn pleading which has sucked an innocent mainland soft goods company into an attachment juggernaut and placed it in the unenviable position of having to prove the a negative. The attachment should be vacated and Top Union China should be reimbursed for the fees and costs that it has incurred proving facts which Industrial Carriers knew or should have known before it ever filed.

## ARGUMENT

### POINT I

**THE RISK OF NON-PERSUASION AS TO WHY THE ATTACHMENT SHOULD NOT BE VACATED RESTS WITH PLAINTIFF**

Plaintiff has incorrectly stated the applicable standard of proof once property has been attached in a Rule B action. While an order of attachment under Rule B may be issued upon a minimal *prima facie* showing at the initial *ex parte* application, once property has been restrained, it is the plaintiff, pursuant to Rule E(4)(f), who must demonstrate why the attachment ***should not*** be vacated. *T&O Shipping, Ltd. v. Lydia Mar Shipping Co. S.A.*, 415 F.Supp.2d 310, 313 (S.D.N.Y. 2006). Rule E(4)(f) unambiguously prescribes this onus of proof upon the plaintiff and if the Plaintiff fails to meet this burden, then the attachment ***must*** be lifted unless the Plaintiff can affirmatively show that reasonable grounds exist for maintaining the attachment. *See, e.g., Proshipline Inc. v. Aspen Infrastructures Ltd.*, No. 07-10969, 2008 U.S. District LEXIS 7884, *8 (S.D.N.Y. Feb. 1, 2008) (*quoting Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006)); *Wajilam Export (Singapore) Pte. Ltd. v. ATL Sipping Ltd.*, No. 05-7955, 2006 U.S. Dist. LEXIS 77033, *7-8 (S.D.N.Y. Oct. 23, 2006).[2]

---

[2] Such challenges generally involve an examination of (a) whether the claim is maritime; (b) whether the defendant is found and (c) whether the property attached is property of the defendant. This motion focuses on the third point

In this case, since Plaintiff is holding assets of a so-called "a.k.a." of the actual defendant (i.e. Dayton), Plaintiff must necessarily come forward with competent and affirmative proof application that the funds seized are (i) property of *the Top Union entity* referred to in the ALEXIS charter, and (ii) that the reference itself in the charter provides a legitimate basis upon which to restrain property of that a.k.a. entity in the first place. ***Plaintiff has done neither.***

As outlined above in the factual section of this brief, there is no affirmative proof that the mere reference in the ALEXIS charter to prior charters being done under "ACCOUNT" of Top Union provides a legitimate basis to freeze assets of all companies with this or a similar name, and Plaintiff's counsel saying it does not make it so.

But more importantly, Plaintiff has not met its burden of showing that the restrained assets of Top Union China <u>are</u> the assets of the a.k.a. defendant Top Union mentioned in the ALEXIS charter. In fact, that entire proposition is, in a word, wrong.[3] What the Plaintiff has done here is to reverse the roles in a Rule B setting, and effectively shift the onus of proof (in essence, proof of a negative) onto Top Union China. This is inappropriate, unfair, and turns the entire Rule B burdens of proof scheme on its head. But even but even with the burden reversal, Top Union China has comprehensively shown its utter lack of involvement, the identity of the real charterer, and the recklessness in the Plaintiff's conduct.

**POINT II**
**AS PLAINTIFF HAS RESTRAINED THE PROPERTY OF THE WRONG ENTITY, THE ATTACHMENT MUST BE VACATED AND THE FUNDS RELEASED**

Inasmuch as the accompanying Reply Huang Declaration and Gutowski Affidavit illustrate the scope of the investigation undertaken by Top Union China and the results, there is

---

as Top Union China is not a proper defendant and had no involvement whatsoever with any of these prior charter transactions or with this string of companies.

[3] The actual charterer behind this string of false companies is some entity called Unicon Trading which does its banking out of Cyprus.

little need to rehash all those factual points here. Suffice it to say there is no legitimate proof anywhere in the record that Top Union China chartered the MANAS or the NAVIOS HERACLES, or has any connection with Dayton, the "Top Union" entity identified in the ALEXIS charter or any of the other bogus entities which Unicon Trading hides behind. At bottom, Plaintiff's entire case rests on: (a) unproven statements made in the ALEXIS fixture recap that the contracting party, Dayton, had performed two prior charters under the name of "Top Union" – which is not true, and (b) a forged document that purports to be an LOI issued by Top Union China which no one can identify or even trace its source or origin.[4]

### A. Top Union China did not charter the NAVIOS HERACLES or the MANAS

It goes without saying that if the underlying facts which are utilized to support the Plaintiff's "a.k.a." premise are not true, then the premise itself most fail. That is the case here, because Plaintiff is simply wrong on its facts.

(i) Hyundai Merchant Marine has confirmed that it never chartered the NAVIOS HERACLES to Top Union.

There is little need to dwell on the purported charter of the NAVIOS HERACLES by an entity calling itself "Top Union". Investigation of that supposed "fact" reveals that the vessel was not in fact ever chartered from this well-know and reputable Korean company Hyundai Merchant Marine ("HMM") to Top Union as Plaintiff claims. Hyundai's New York counsel has confirmed this in unequivocal fashion after Top Union China initiated an investigation and served subpoenas on Hyundai's New Jersey office.

> We refer to your email below of yesterday. HHM previously advised us that it
> Never had a charter party with Top Union.

---

[4] Insofar as the Infospectrum report is concerned, that does more to support Top Union China's position of no involvement than it does support the Plaintiff's.

(See, Gutowski Reply Aff'd ¶'s 9-22 and Ex. 9, email from attorneys for HHM confirming vessel chartered to a "Top Union".)[5]

The lengths to which Top Union China has gone to prove the negative, and breath of its investigation around the world, underscores the *bona fide* nature of its position (i.e. that it had no involvement with any of these companies or any of these charters). If Top Union China was really the man behind the curtain, so to speak, as Plaintiff claims it was, it would have never authorized or undertaken such a broad and encompassing investigation because to do so would have resulted in shooting its own foot.

(ii)   Top Union China was the charterer of the MANAS either.

With respect to the MANAS charter, Top Union China undertook an exhaustive investigation in an effort to confirm with the brokers, the agents and the owners that their company was not involved. Confirmation of this fact was obtained from Neva Delta, a reputable Russian based shipping company, as well as from Tongsheng International Shipping. (Huang Reply Declaration at 21-26, Exhibits 2-4, ¶'s 77-90 and Exhibits 9 &10.) Insofar as Connie Lim, the broker at Paksu, is concerned, she has now clarified that she never had any direct contact with the individuals behind the entity calling itself "Top Union" so reliance on her by the Plaintiff is utterly misplaced. (See, Huang Reply Declaration at ¶'s 70-75.)

The evidence disclosed as a consequence of this investigation which perhaps has the most significance is the wire transfer banking records which reveal where the freight came from on the MANAS. As outlined above, the party that paid the freight for the use and operation of the MANAS was not Top Union China, or any company even located in Asia. It came from Unicon Trading, from an account in Cyprus and was paid directly to the owners of the MANAS, Paksu,

---

[5] It is clear from the record that Plaintiff conducted no investigation whatsoever with HMM to determine whether the unsubstantiated statement in the ALEXIS charter regarding the NAVIOS HERACLES was in fact true. Had it done so, it would of found out the information was false.

(See, Huang Declaration at Exhibit 5, showing (i) ordering customer Unicon Trading; (ii) beneficiary Paksu and (iii) sender's bank FBME bank in Cyprus.)

As outlined in the Huang Reply Declaration, Top Union China has never heard of Unicon, has no offices in Belize, has no bank accounts with FMBE Bank and its transactions are done exclusively through the Hangseng Bank which is a branch of HSBC Bank in Hong Kong. (Huang Reply Declaration ¶ 30-34 & 60-61.)[6] Clearly, the freight remittance documentation for the MANAS fixture disproves the allegation being asserted by Plaintiff that Top Union China was the entity that chartered the MANAS.

In addition, and of greater import, it has also now been revealed that the Plaintiff Industrial Carriers received its freight payment on the ALEXIS *from this very same entity* (Unicon Trading). (See, Gutowski Reply Aff'd at ¶'s 34-42 & Ex. 10 showing Unicon Trading paid the freight on the ALEXIS to Plaintiff c/o its receiving agent Weaver Investments.) The fact that Unicon Trading consistently appears as the entity paying the freight reinforces who the real charterer was behind this string of sham entities, including "Dayton" and "Top Union".

### B. *The LOI is Completely Bogus*

The remaining piece of "evidence" upon which the Plaintiff relies is an LOI which purportedly was given by Top Union China to the owners of the MANAS. As the Reply Huang Declaration and the true corporate records of Top Union China attached thereto demonstrate (Huang Reply Dec'l. ¶'s 35-63), the LOI is a forged document which was not, and could not have been, issued by Top Union China.

- The logo used on the LOI is not that of Top Union China. (¶'s 41-42)
- The stamp on the LOI is not that of Top Union China. (¶'s 43-48)

---

[6] This fact is further illustrated by the wire transfer that was restrained by Plaintiff. The wire transfer restrain reflects that the funds originated with the Hang Seng Bank in Hong Kong and were attached by HSBC Bank as they passed through New York.

NYDOCS1/299043.1                                    9

- The stamp on the LOI is in square format contrary to the practice of Chinese companies to use round format stamps. (¶ 44)
- Top Union China signs its documents with traditional Chinese characters, not with western-style signatures as the one that appears on the LOI. (¶¶49-53)
- The address used on the LOI is not the principal place of business for Top Union China but rather the address of the company's incorporator, an address used by dozens and dozens of corporations that used the same incorporator. (¶¶54-60)

Independent evidence corroborating the fraudulent nature of the LOI is found in the remittance documentation discussed above which show that Unicon actually paid the freight. Finally, there is nothing in the record which establishes where that piece of paper came from, how it got into the Paksu file, when, or the manner in which it was transmitted to Paksu (i.e. fax, email). The document itself bears no transmittal record.[7] Plaintiff's reliance upon the LOI to support the attachment is untenable.

### C. *The Infospectrum Report*

The Infospectrum Report provides no basis for maintaining the attachment. It is a document redolent with rumor and rank speculation, and the investigation failed to follow the money trail which would have revealed Unicon. The Report only serves to reinforce that the names being utilized by Unicon were illusory, but it in no way confirms involvement by Top Union China. The mere fact that Top Union China was indeed a legitimately formed Hong Kong entity is no basis to connect it with Dayton or anyone else.

The facts of this case are not dissimilar to those of *Atwood Navigation, Inc. v. M/V RIZAL*, No. 89-1221, 1989 U.S. Dist. LEXIS 1828 (E.D.Pa. Feb. 24, 1989). There, plaintiff brought a Rule B and Rule C action against the defendant's vessel. Plaintiff argued that through brokers, it had concluded a charter party with the defendant. Upon attachment of its vessel,

---

[7] It also bears mention that Plaintiff has not produced a single operational communication from Top Union China to any of the brokers, agents or owners of the NAVIOS HERACLES or MANAS. This Court needs no citation to the fact that the operation of a vessel is complex and international charter party results in the production of dozens if not hundreds of operational communications. If Top Union China was the charterer of these two ships, how did it manage to do so without a single piece of written correspondence?

defendant moved to vacate on the ground that plaintiff had restrained property of the wrong entity, as the defendant had never entered into any kind of negotiations or contract with plaintiff. In granting the motion on the basis that plaintiff had failed to meet its burden of proof, the district Court stated:

> At the post-attachment review state, the plaintiff bears the burden to show why the attachment should not be vacated. . . . . But plaintiff has entirely failed to meet this burden. There is no evidence whatsoever in the record that the alleged negotiations leading up to the alleged formation of the charter party between [plaintiff] and [defendant] ever took place. Plaintiff has failed to provide the court with any evidence that [defendant] was the entity directly or even indirectly with which it was allegedly negotiating via the telexes included as attachments in the record. None of the papers before the court other than the pleadings, contain the name of the defendant owner of the vessel.

1989 U.S. Dist. LEXIS 1828, *3-4.

Here, neither the Complaint nor the ALEXIS fixture identify Top Union China as a contracting party. Indeed, Plaintiff has not even alleged (much less proved) that Top Union China was the entity with which it negotiated, directly or indirectly, the ALEXIS fixture. Rather, Plaintiff has assumed that Top Union China might be Dayton on the flimsy and unsupported statement found in the ALEXIS fixture recap to the effect that prior charters were under "account Top Union." Plaintiff has attached *ex parte* close to $1 million belonging to Top Union China, the wrong entity, not named in the Complaint, without any real investigation, and the investigation undertaken by Top Union China has revealed the real party behind these fixtures. Given that Plaintiff failed to carry out its burden of proof, the attachment must be vacated. The attachment was reckless, and as this is the standard against which a fee award can be imposed, Top Union China should be given leave to submit affidavit of the fees and costs it has incurred and those fees and costs awarded to it.

## CONCLUSION

For all the foregoing reasons, Top Union China's funds should be released immediately and Top Union China should be awarded its interest, costs and attorneys' fees in connection with this application.

Dated: New York, New York
       February 27, 2008

                              Respectfully submitted,

                              FREEHILL HOGAN & MAHAR, LLP
                              Attorneys for Interested Party
                              Top Union (China) Limited

By: _____
       Peter J. Gutowski (PG 2200)
       Manuel A. Molina (MM 1017)
       80 Pine Street
       New York, NY  10005
       (212) 425-1900
       (212) 425-1901 (fax)